JOURNAL ENTRY AND OPINION
{¶ 1} Appellant-Defendant Anthony Frazier ("Appellant") appeals from his conviction for felonious assault. For the reasons set forth below, we affirm.
 {¶ 2} On January 30, 2003, the Appellant was indicted on four counts: one count for attempted murder, in violation of R.C.2923.02/2903.02, with notice of prior conviction and firearm specifications; one count of felonious assault, in violation of R.C. 2903.11, with notice of prior conviction and firearm specifications; another count of felonious assault, in violation of R.C. 2903.11, with notice of prior conviction and firearm specifications; and one count of having a weapon while under disability, in violation of R.C. 2923.13, with firearm specifications.
 {¶ 3} On August 25, 2004, Appellant signed a jury waiver form and the trial judge proceeded to trial. Prior to presenting the evidence, the parties stipulated that the police recovered two shell casings from the scene of the crime and that these shell casings matched an operational firearm which was seized from Appellant during another investigation. Subsequently, the court heard the testimony of four witnesses: William Mines, Charlene Skovich, Joshua Gooden and Elvin Maldonado.
 {¶ 4} William Mines testified that on December 16, 2002, he was walking home from work when the Appellant approached him in a vehicle. The Appellant eventually exited the vehicle with another person and ran after Mr. Mines. While one man was in front of him and one behind, he was struck in the head. He ran towards these individuals who then fled.
 {¶ 5} Mr. Mines later decided to find these individuals. In his pursuit, he saw Joshua Gooden and his brother, Jeremiah, who were driving in a car. Mr. Mines entered the vehicle and informed the individuals about his earlier confrontation with the Appellant. The three drove around for five minutes in pursuit of the Appellant. When the three decided to take Mr. Mines to his residence, they observed seven or eight people outside his residence. Therefore, Jeremiah decided to park the car in the back of Joshua's home.
 {¶ 6} The three exited the vehicle and walked through an alley towards Joshua's house when they saw the Appellant and two or three males coming through the alley. Mr. Mines then testified that he noticed a firearm pointed at him. Joshua's girlfriend, Charlene Skovich, attempted to exit the house when Joshua pushed her back into the house. Once inside the house, Mr. Mines heard windows breaking and saw glass falling into the house. He, thereafter, looked outside the kitchen window and saw Joshua standing in the alley approximately 15 feet from Appellant who was pointing a gun at Joshua. Mr. Mines testified that he heard two gunshots.
 {¶ 7} Further, Mr. Mines testified that prior to the incident on December 16, 2002, he did not know the Appellant, but had witnessed an altercation that involved the Appellant.
 {¶ 8} At the time of the incident, Mines testified that he did not know Appellant's name, but learned shortly thereafter from a friend, Elvin Maldonado, after giving a description of the Appellant.
 {¶ 9} Charlene Skovich, Joshua's girlfriend, testified that on December 16, 2002, two men she did not know came to her house looking for Joshua, Mr. Mines and Elvin Maldonado. The men left after she told them she was unaware of the other three men's whereabouts. Fifteen minutes later, Joshua, Mr. Mines and Jeremiah appeared at the house and Ms. Skovich informed Josh of the visitation.
 {¶ 10} Joshua returned outside and Ms. Skovich followed at which time she witnessed the Appellant pointing a gun at them. Joshua pushed her back inside and went back outside to get Mr. Mines and Jeremiah to come inside the house. After all were in the house, she observed her dining room windows being broken by the men outside. Josh then exited the house again.
 {¶ 11} Ms. Skovich testified that she witnessed from the kitchen window Joshua and Appellant exchanging words. She next heard the Appellant's companion tell the Appellant to shoot and saw the Appellant shoot two rounds of the firearm, play with his gun, and shoot three or four more rounds. Appellant and his companion then ran from the scene. She testified that she was in the kitchen alone when the shooting occurred.
 {¶ 12} Ms. Skovich also testified that she did not know the Appellant's name prior to this incident, but later learned his name after describing him to a friend, Elvin Maldonado.
 {¶ 13} Joshua Gooden, the victim, testified that on December 16, 2002, he and his brother were driving in a car when they saw William Mines. They picked up Mr. Mines, who informed them he had an altercation with a couple of men earlier that day. While driving to Mr. Mines' home, the men observed four or five individuals in front of Mr. Mines' house. Jeremiah then drove to Joshua's house and parked the vehicle in the back.
 {¶ 14} Joshua entered the house and spoke with Ms. Skovich, who informed him of the two recent visitors. Joshua stepped outside with Ms. Skovich when he saw Appellant at the side of the house with a firearm and two other men in the yard. He pushed Ms. Skovich back into the house and entered along with Mr. Mines. He called for his brother to also come into the house. While in the house, Joshua heard windows shattering and saw broken glass fall into the house.
 {¶ 15} Joshua then exited the house and followed the Appellant and another individual to the back of the house. He was exchanging words with the Appellant when the Appellant raised his firearm and shot two rounds at him. Joshua ducked and Appellant fired three more rounds. Appellant then fled down the alley.
 {¶ 16} Prior to this incident, Joshua had no contact with the Appellant. He only learned of the Appellant's name after he gave a description to a friend, Elvin Maldonado.
 {¶ 17} Elvin Maldonado testified that he is a friend of Mr. Mines, Joshua and Ms. Skovich. On December 16, 2002, he spoke with these individuals who informed him of the incident earlier that day. They gave Mr. Maldonado a description of the shooter. Based upon this description, Mr. Maldonado determined that the shooter was the Appellant.
 {¶ 18} On August 27, 2004, the trial court found the Appellant not guilty of attempted murder as charged in Count I and nolled the felonious assault charge in Count II. The court, however, found Appellant guilty of felonious assault with notice of prior conviction and firearm specifications as charged in Count III and guilty of having a weapon under disability with firearm specifications as charged in Count IV. Consequently, the court sentenced the Appellant to a five year prison sentence.
 {¶ 19} Appellant now appeals and submits two assignments of error for our review.
 {¶ 20} The first assignment of error states:
 {¶ 21} "The trial court erred in permitting the state to offer unfairly prejudicial `other acts' testimony in violation of Evidence Rules 403, 404, and R.C. 2945.59 and Appellant's rights under Article I Sec. 16 of the Ohio Constitution and theFourteenth Amendment to the United States Constitution."
 {¶ 22} Appellant maintains that, over defense counsel's objection, the trial court improperly allowed a witness to testify to a prior altercation involving Appellant. Appellant asserts that the prosecutor used this testimony regarding the prior act to establish Appellant was a "violent" person and acted in the same way in the instant matter. Appellee maintains that the prosecutor elicited the testimony to establish the witness' knowledge of Appellant for purposes of identification.
 {¶ 23} As an initial matter, we note that it is axiomatic that "the admission or exclusion of relevant evidence rests within the sound discretion of the trial court." State v. Sage
(1987), 31 Ohio St.3d 173, 510 N.E.2d 343, paragraph two of the syllabus; see, also, State v. Bey, 85 Ohio St.3d 487, 490,1999-Ohio-283, 709 N.E.2d 484. Where an error in the admission of evidence is alleged, appellate courts do not interfere unless it is shown that the trial court clearly abused its discretion.State v. Maurer (1984), 15 Ohio St.3d 239, 473 N.E.2d 768. Thus, the admission or exclusion of evidence, including the admission of other acts evidence, lies within the trial court's sound discretion. State v. Bey, supra.
 {¶ 24} Evid.R. 404(B) provides that evidence of other acts is not admissible to prove the character of a person in order to show that the accused acted in conformity therewith. Evidence of other bad acts is generally prejudicial and generally is prohibited by Evid.R. 404(B). See, e.g., State v. Curry
(1975), 43 Ohio St.2d 66, 68-69, 330 N.E.2d 720.
 {¶ 25} Generally, "an accused cannot be convicted of one crime by proving he committed other crimes or is a bad person."State v. Thornton (April 1, 1999), Cuyahoga App. No. 73232, citing State v. Jamison (1990), 49 Ohio St.3d 182,552 N.E.2d 180. Consequently, "evidence of other crimes, wrongs or bad acts independent of, and unrelated to, the offenses for which a defendant is on trial is generally inadmissible to show criminal propensity." Id.
 {¶ 26} There is, however, an exception to the general rule against admissibility of prior bad acts:
 {¶ 27} "While `other acts' evidence may not be used to prove criminal propensity, such evidence may be admissible `if (1) there is substantial proof that the alleged other acts were committed by the defendant, and (2) the evidence tends to prove notice, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" Id., citing Statev. Lowe, 69 Ohio St.3d 527, 530, 1994-Ohio-345, 634 N.E.2d 616; see, also, Evid.R. 404(B); R.C. 2945.59.
 {¶ 28} "Other acts" evidence may be admissible for purposes of identification of the perpetrator of a crime. State v.Gasaway (Dec. 1, 1977), Franklin App. No. 77AP-486. As stated inState v. Curry (1975), 43 Ohio St.2d 66, 73, 330 N.E.2d 720, "the identity of the perpetrator of a crime is the second factual situation which `scheme, plan or system' evidence is admissible."
 {¶ 29} Even if relevant, however, evidence of prior acts must be excluded if the probative value is outweighed by the prejudicial impact on the defendant. State v. Mann (1985),19 Ohio St.3d 34, 36-37, 482 N.E.2d 592. Therefore, "the prosecution may not introduce evidence of other criminal acts of the accused unless the evidence is substantially relevant for some purpose other than to show a probability that the individual committed the crime on trial because he is a man of criminal character. * * *" Id., quoting State v. Lytle (1976), 48 Ohio St.2d 391,401-402, 2 Ohio Op.3d 495, 358 N.E.2d 623, vacated in part on other grounds (1978), 438 U.S. 910, 57 L.Ed.2d 1154,98 S.Ct. 3135.
 {¶ 30} In this case, the prior bad act which was introduced into evidence was the accusation that a witness, William Mines, had observed a prior altercation involving Appellant. This issue arose on the direct examination of Mr. Mines who testified:
 {¶ 31} "* * *
 {¶ 32} "Q. Did you ever have contact with Anthony Frazier?
 {¶ 33} "A. No.
 {¶ 34} "Q. You've never had contact with him?
 {¶ 35} "A. No.
 {¶ 36} "Q. You've never seen him before?
 {¶ 37} "A. Yes, I seen him before.
 {¶ 38} "Q. Okay. How many times have you seen him before, say December 16th of 2002?
 {¶ 39} "A. Yeah, maybe once, yeah.
 {¶ 40} "Q. You're not sure whether you saw him?
 {¶ 41} "A. Yes. I saw him. Yes, I did see him.
 {¶ 42} "Q. Okay. Can you tell us what were the circumstances around this first encounter?
 {¶ 43} "MR. McDONNELL: Objection.
 {¶ 44} "THE COURT: Objection's overruled.
 {¶ 45} "A. He was fighting with a neighbor, and it was just a big altercation. I don't know. I was just watching. I just —
 {¶ 46} "Q. So you were a spectator?
 {¶ 47} "A. No, no I was just looking. I was an onlooker.
 {¶ 48} "Q. Okay. So did you know Mr. Frazier at that time by name?
 {¶ 49} "A. No.
 {¶ 50} "Q. Okay. But you had seen him?
 {¶ 51} "A. Yes. * * *."
 {¶ 52} We find that the trial court erred in admitting the other acts testimony which was irrelevant to the charge at issue. Given the plethora of other evidence establishing that Appellant was the perpetrator of the crimes at issue in this case, the minimal probative value of the evidence was substantially outweighed by the danger of unfair prejudice to Appellant. The evidence had the possibility of inferring that Appellant was a violent person and acted in the same way in the instant matter. However, despite the statement's improper admission, we find it to be harmless error. Pursuant to Crim.R. 52(A), "any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." To find an error harmless, an appellate court must be able to declare a belief that the error was harmless beyond a reasonable doubt. Lytle,
supra. An appellate court may overlook an error where the other admissible evidence, standing alone, constitutes "overwhelming" proof of guilt. State v. Williams (1983), 6 Ohio St.3d 281, 6 OBR 345, 452 N.E.2d 1323, paragraph six of the syllabus. "Where there is no reasonable possibility that unlawful testimony contributed to a conviction, the error is harmless and therefore will not be grounds for reversal." State v. Brown,65 Ohio St.3d 483, 485, 1992-Ohio-61, 605 N.E.2d 46.
 {¶ 53} In the case sub judice, there was overwhelming proof of the Appellant's guilt, despite the inadmissible testimony. It was undisputed that the police recovered two shell casings from the scene of the crime and that the shell casing matched an operational firearm seized from the Appellant. Moreover, three eyewitnesses testified that they saw Appellant with a firearm and that Appellant fired a number of rounds toward the victim. In light of this other evidence, the judgment of the trial court would not have been otherwise. Accordingly, the first assignment of error is overruled.
 {¶ 54} Appellant's second assignment of error states:
 {¶ 55} "Appellant's conviction for felonious assault was against the manifest weight of the evidence."
 {¶ 56} In State v. Thompkins, 78 Ohio St.3d 380, 388,1997-Ohio-52, 678 N.E.2d 541, the court illuminated its test for manifest weight of the evidence as follows:
 {¶ 57} "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." Black's [Law Dictionary (6 Ed. 1990)], at 1594."
 {¶ 58} When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "`thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. Id., citing Tibbs v. Florida (1982), 457 U.S. 31,45, 102 S.Ct. 2211, 72 L.Ed.2d 652. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the court clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. See Statev. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.
 {¶ 59} The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. Id.
 {¶ 60} In this matter we cannot conclude that the court lost its way. It is undisputed that the police recovered two shell casings from the scene, which matched an operational firearm seized from Appellant. Additionally, three eyewitnesses testified that they saw Appellant with a firearm and that Appellant fired a number of shots towards the victim. This evidence is more than sufficient to allow the trial court to properly enter its verdict.
 {¶ 61} It is irrelevant that trivial aspects of the three witnesses testimony were not exactly alike. While the intricate details of the number of people standing outside Mr. Mines' home or the exact number of shots fired were not exactly alike, all three agreed on the substance of the circumstances surrounding the shooting. Therefore, after reviewing the entire record, weighing the evidence and all reasonable inferences and considering the credibility of witnesses, we find that the trial court did not lose its way. Appellant's second assignment of error is without merit.
The judgment is affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Blackmon, A.J., and Sweeney, J., concur.